UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

No 05-CV-3731 (JFB) (WDW)

———————————

JOSEPH & MARIA BURKE,

Plaintiffs,

VERSUS

QUICK LIFT, INC., ET AL.

Defendants.

———————————

MEMORANDUM AND ORDER
April 11, 2008

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Joseph and Maria Burke (collectively, the "Burkes" or "plaintiffs") bring this maritime and derivative torts action against defendants Quick Lift, Inc., ("Quick Lift") and Staten Island Boat Sales ("SIBS") (collectively, "defendants"), alleging that the Burkes were injured as a result of defendants' failure to properly install a piece of equipment on a yacht purchased by the Burkes. This Court has jurisdiction over the Burkes' claim under 28 U.S.C. §§ 1333 and 1367. Presently before the Court is defendant SIBS's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is denied.

I. BACKGROUND

A. FACTS

The facts described below are taken from the parties' depositions, affidavits, exhibits and defendant's Local Rule 56.1 statement of facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York,* 422 F.3d 47, 50 (2d Cir. 2001).[1]

In 2000, Joseph Burke purchased a powerboat from SIBS. (Defs.' 56.1 ¶ 1.) The

_____

[1] Unless otherwise noted, when one party's Rule 56.1 Statement is cited, the opposing party does not dispute that fact or has offered no evidence to controvert that fact.

powerboat purchased by Joseph Burke was a Carver 450 Voyager Pilothouse, manufactured by Carver Boat Corporation ("Carver"). (Defs.' 56.1 ¶ 2.) Joseph Burke accepted the 45-foot long powerboat on or about June 9, 2000, and executed a document whereby he confirmed that the vessel was in good working condition and met all of his expectations. (*Id.*)

In 2000, SIBS purchased a davit which was manufactured and installed on the powerboat by Quick Lift. (Defs.' 56.1 ¶ 3.) The Quick Lift invoice reflects that the davit purchased by SIBS for installation on Burke's boat was a Model QLH 8000. (Defs.' 56.1 ¶ 4.) The davit was shipped to SIBS from the Quick Lift facility in Miami, Florida. (*Id.*) A davit is a crane like device that is utilized for raising and lowering boats, anchors, etc. (Defs.' 56.1 ¶ 4, n.1.) In the realm of luxury powerboats, the davit is generally utilized to raise and lower small auxiliary vessels, also known as tenders or dinghies. (*Id.*) It is comprised of a shaft or standpipe, which is mounted to the boat, and a "boom" which extends out from the standpipe. (*Id.*)

The davit was installed on SIBS's premises by two Quick Lift employees, Daniel Piles ("Piles"), who was also the Vice-President of Sales, and his brother, Salvatore Piles, Jr. (Defs.' 56.1 ¶ 5.) Although Piles had done some 300 davit installations over the course of his 10-year career, he believed that the date in question was the first time he had installed a davit on a Carver boat. (Defs.' 56.1 ¶ 10.) Piles had seen factory installations on other Carver boats, but only by looking from the outside. (*Id.*) As such, Piles did not know exactly how the davits had been installed by Carver and he did not know if they were installed in the same manner in which he had installed the davit on the Burkes' boat. (*Id.*)

Michael Omanski, a Regional Service Manager for Carver, testified that davits are meant to be installed in a particular location "on the aft section of the bridge" of the subject boat. (Defs.' 56.1 ¶ 11.) Indeed, there is a round-shaped "landing" on the upper deck of the Carver boat on which the round, upper plate of the davit is supposed to be mounted. (*Id.*) The landing is constructed of fiberglass and there is an aluminum plate laminated within the upper deck. (*Id.*) The aluminum plate is three-eighths of one inch thick and shaped like a doughnut. (*Id.*) Significantly, there is no such aluminum plate embedded in the lower deck, where the davit's base is mounted. (*Id.*) The area where the davit is installed was specifically engineered for this purpose by Carver. (Defs.' 56.1 ¶ 12.) Indeed, the very reason why the embedded plate on the upper deck was doughnut-shaped was to accommodate a davit. (*Id.*) In effectuating davit installations, Carver secures the upper plate of the davit to the upper deck by drilling and screwing or "tapping" directly into the upper deck and the doughnut-shaped aluminum plate embedded within. (Defs.' 56.1 ¶ 13.) The base of the davit is "through bolted" to the lower deck and to an aluminum backing plate which is added. (Defs.' 56.1 ¶ 14.) Omanski testified that the "through bolt" installation is easier when done while the boat is being assembled, but can still be done in an after-market installation. (*Id.*) That is, once the boat is constructed it is still possible to add the backing plate and through bolt and use washers and locknuts to secure the base down. (*Id.*)

James Berkebile, Vice President for New Product Development for Carver Boat

Corporation inspected the subject boat. Upon looking at the location where Quick Lift's davit was installed in this case, Berkebile testified that the davit was installed in the proper location. (Defs.' 56.1 ¶ 15.) Indeed, the davit was installed in the same location as the factory-installs by Carver, but it was done "in a different manner." (*Id.*) Specifically, Berkebile stated that, when the davit is factory-installed, a plate is added and the davit is through bolted. (Id.) Omanski defined "through bolted" as twining a bolt through the top of the davit's bottom base plate and securing it on the bottom with washers and a nut. (*Id.*) Piles had mounted the Quick Lift davit's base plate to the boat's lower deck "in a different manner than a factory-installed installation." (*Id.*)

Significantly, Piles admitted that while he knew of the location on the subject boat where davits were installed by Carver, he did not know the details of the manner of proper installation. (Defs.' 56.1 ¶ 16.) In installing the davit on the Burkes' boat, Piles opened a hole in the area of the upper deck which had been designed to accept the davit. (Defs.' 56.1 ¶ 17.) Upon opening the hole in the upper deck, Piles physically observed the aluminum plate embedded within the upper deck in that area. (Defs.' 56.1 ¶ 18.) Piles then applied adhesive and, using "sheetmetal" screws, he screwed the top plate of the davit into the upper deck and the embedded, doughnut-shaped aluminum plate. (*Id.*) After he installed the top plate on the upper deck, Piles then installed the base plate on the lower deck. (Defs.' 56.1 ¶ 19.) To do so, he applied adhesive under the base plate and used "[i]nch and a quarter stainless steel" self-tapping, sheetmetal screws which he screwed into the lower deck. (*Id.*) Piles testified that he thought he was screwing into an aluminum plate that he believed was embedded in the fiberglass deck. (Defs.' 56.1 ¶ 20.) Although he had pre-screwed the holes into the lower deck, Piles did not recall if he observed any metal shavings. (*Id.*) Moreover, although Piles acknowledged that he can generally feel if he is hitting metal while drilling such holes, he could not recall if he had felt metal when he pre-drilled the holes into the lower deck. (*Id.*) As such, Piles acknowledged that he did not know whether he was screwing into a fiberglass mat, plywood, or anything else as he installed the base plate on the lower deck. (*Id.*) Piles did not use any "through bolts" or other anchoring in installing the davit's base plate on the lower deck. (Defs.' 56.1 ¶ 21.) When asked if he could have through-bolted the base plate, Piles stated that there was no room on the underside of the lower deck to have done so. (*Id.*) As noted, however, the manufacturer uses through bolting and an aluminum backing plate in mounting the base plate during post-manufacture davit installations on the subject Carver boat. (Defs.' 56.1 ¶ 22.) According to plaintiff Joseph Burke, after the davit's mounting apparatus failed, it was reinstalled by another davit company, which installed a large metal plate underneath the bottom plate of the davit and through-bolted the davit's bottom plate to the metal plate underneath. (*Id.*)

SIBS asserts that Piles admitted that SIBS had no direct involvement in the manner of the installation of the subject davit. (Defs.' 56.1 ¶ 23.) Plaintiffs contend, however, that an SIBS employee named "Joey"[2] directed

---

[2] There is some dispute between the parties as to the identity of "Joey." SIBS suggests that "Joey" is Joseph Deluca, who is the Parts Manager for SIBS. Plaintiffs suggest that "Joey" may be a different SIBS employee named "Joe Martinez" or

Piles where to install the davit and, therefore, SIBS should be considered as being involved in the installation. (Pls.' Response to Defs.' 56.1 ¶ 23.) However, according to the Affidavit of Joseph "Joey" Deluca, who was the Parts Manager for SIBS in 2000 and responsible for ordering the davit from Quick Lift, his involvement with the davit ended when Quick Lift took the davit out of his parts department on the date of the installation. (Defs.' 56.1 ¶ 24.) Indeed, Deluca stated that he never saw the location on the boats where the davits were to be installed, and he never gave any direction to Quick Lift regarding the means, manner or method of their davit installation. (*Id.*) Piles testified, however, that "Joey" told him that the boat was reinforced and instructed Piles as to the location for the installation. (Piles Dep. 41:19-22; 42:19-23; 92:3-10, Mar. 22, 2007.) Piles did nothing to confirm "Joey's" statement that the deck was reinforced, *i.e.*, he did not contact the manufacturer. (Defs.' 56.1 ¶ 27.) Neither Piles nor Quick Lift maintained a library of manufacturer's plans, specifications or instructions regarding the different boats on which davits were installed. (*Id.*)

On April 19, 2005, Maria Burke was allegedly injured when the davit's bottom mounting apparatus failed while lifting a dinghy out of the water. (Defs.' 56.1 ¶ 6.)

---

some other employee. However, for purposes of this motion, it does not matter what the last name of "Joey" is because (1) it is undisputed that the "Joey" to whom Piles claims to have spoken was an SIBS employee, and (2) the Court must assume that Piles' version of the conversation is true (rather than Joseph DeLuca's version of events, assuming Piles was referring to him) for purposes of this summary judgment motion.

According to plaintiffs' expert, Jonathan J. Howe, Accredited Marine Surveyor, he inspected the subject boat and davit on May 4, 2005, which is approximately two weeks after the April 19, 2005 accident. (Defs.' 56.1 ¶ 28.) He estimated that the total weight of the dinghy was approximately 500 pounds, which was within 800-pound nominal lifting capacity of the davit. (*Id.*) Howe's report concluded as follows:

> In conclusion, it is my opinion that the failure of the davit was due to poor installation of the davit base, including use of self-tapping screws, minimal diameter of the base plate, poor adhesion of the polyurethane adhesive to the fiberglass and especially, lack of thru bolts and a backing plate. The davit itself did not fail, rather the installation was at fault.

(*Id.*)

B. PROCEDURAL HISTORY

On August 5, 2005, plaintiff filed a complaint against defendants Quick Lift and SIBS, alleging a maritime tort claim against both defendants for negligent installation, and a derivative claim for loss of consortium. Specifically, the complaint alleges, among other things, the following: "SIBS, acting through Quick Lift, and Quick Lift, had a duty to the Burkes to properly install the davit. They breached that duty, and the Burkes have suffered damages that SIBS's and Quick Lift's negligence proximately has caused . . . ." (Compl. ¶ 34.) The complaint asserted two claims against SIBS – namely, negligence (Count One) and breach of warranty (Count Two). On June 8, 2006, the Court "so ordered" a stipulation discontinuing the

4

breach of warranty cause of action with prejudice. Therefore, the only remaining claim against SIBS is negligence.

On October 12, 2005, Quick Lift filed a third-party complaint against Carver, alleging that any damages suffered by the Burkes were caused by the third-party defendant Carver.

On July 14, 2006, defendants SIBS and Quick Lift moved to dismiss the Burkes' complaint. On July 14, 2006, third-party defendant Carver moved to dismiss Quick Lift's third-party complaint and, in a separate motion, to impose sanctions against Quick Lift for filing a frivolous pleading. On November 16, 2006, the Court denied the motion to dismiss by defendants SIBS and Quick Lift, denied third-party defendant Carver's motion to dismiss the third-party complaint, and denied Carver's motion for sanctions against Quick Lift, Inc.

On November 19, 2007, a stipulation and order of dismissal was entered discontinuing the third party action against Carver.

On December 21, 2007, defendant SIBS filed a motion for summary judgment on the remaining negligence claim against it. The motion was fully submitted on February 1, 2008 and oral argument took place on April 4, 2008.

## II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in Anderson, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth

"concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

III. DISCUSSION

Defendant SIBS argues that it is not liable for the actions of Quick Lift because Quick Lift is an independent contractor. Plaintiff contends, however, that SIBS is liable because it was negligent in selecting, instructing, and supervising Quick Lift as the independent contractor. For the reasons discussed below, the Court concludes that there are disputed issues of material fact that prevent summary judgment on the negligence claim as to SIBS.

"It is fundamental that to recover in a negligence action a plaintiff must establish that the defendant owed him a duty to use reasonable care, and that it breached that duty." *Turcotte v. Fell*, 68 N.Y.2d 432, 437, (N.Y. 1986). "In the absence of a duty, as a matter of law, no liability can ensue." *Gonzalez v. Pius*, 525 N.Y.S.2d 868, 869 (App Div. 1988). Under New York law, "[t]he general rule is that an employer who hires an independent contractor is not liable for the independent contractor's negligent acts." *Rosenberg v. Equitable Life Assur. Soc.*, 79 N.Y.2d 663, 668 (N.Y. 1992); *see also Chainani v. Board of Educ. of N.Y.*, 87 N.Y.2d 370, 380-81 (N.Y. 1995) ("Ordinarily, a principal is not liable for the acts of independent contractors in that, unlike the master-servant relationship, principals cannot control the manner in which the independent contractors' work is performed."). The courts have acknowledged three exceptions to this general rule. In particular, "[a] party who retains an independent contractor can be held liable for the independent contractor's negligent acts where: (1) the party negligently selected, instructed, or supervised the contractor; (2) the employment was for work that is inherently dangerous; and (3) the party was under a specific nondelegable duty." *Longview Fibre Co. v. CSX Transp., Inc.*, 526 F. Supp. 2d 332, 339 (N.D.N.Y. 2007) (citing *Kleeman v. Rheingold*, 81 N.Y.2d 270, 274 (N.Y. 1993) (citing sources)).

With respect to first category, as the New York Court of Appeals noted in *Kleeman*, "although often classified as an 'exception,' this category may not be a true exception to the general rule, since it concerns the employer's liability for its own acts or omissions rather than its vicarious liability for the acts and omissions of the contractor." *Kleeman*, 81 N.Y.2d at 274 n.1; *accord Becker v. Poling Transp. Corp.*, 356 F.3d 381, 389 (2d Cir. 2004).

In the instant case, as clarified at oral argument, plaintiff is proceeding under the above-referenced first theory of liability outlined under the New York law in connection with the work of an independent contractor – namely, negligent selection, supervision, and instruction. It is to this issue that the Court will now turn.[3]

---

[3] Plaintiffs suggested in their brief that they also were pursuing a claim under the theory that SIBS had a nondelegable duty to install the davit and, thus, had liability for any harm that flowed from such installation by a third party. SIBS countered

that there was no nondelegable duty because SIBS did not undertake or assume any duty to plaintiff as to the davit, nor did SIBS ever represent to plaintiffs (or anyone else) that it was installing the davit. (Defs.' Reply ¶ 26.) At oral argument, plaintiffs' counsel clarified that plaintiffs did not intend to pursue this theory. In any event, the Court finds that, even if plaintiffs wished to pursue this theory of liability, no nondelegable duty exists in this case based on the undisputed facts. The nondelegable duty exception is commonly applied in cases where there is a duty imposed by regulation or statute. *See Gerbino v. Tinseltown USA*, 788 N.Y.S.2d 538, 541 (App. Div. 2004) (holding that property owner was vicariously liable for independent contractors' negligence based on its nondelegable duty to keep the premises safe.) Although there is no applicable regulation or statute in the instant case, New York courts also have found nondelegable duties in the absence of a regulation or statute where a defendant assured the customer that it would not delegate the work. *See, e.g., Miles v. R&M Appliance Sales, Inc.,* 26 N.Y.2d 451, 454 (N.Y. 1970) (finding a nondelegable duty where vendor repeatedly assured customer that vendor would be repairing the air conditioner unit.); *cf. Mondello v. N.Y. Blood Ctr.,* 80 N.Y.2d 219 (N.Y. 1992)(finding that a nondelegable duty did not exist where the hospital did not hold itself out as having screened blood for contagious disease or furnish any personnel for that purpose. The plaintiff's subjective belief is not enough to impose liability upon the hospital for the acts of an independent contractor.) However, in the instant case, there is no evidence in the record, or anywhere in plaintiffs' submission, that an affirmative representation was made that SIBS would be installing the davit. In fact, plaintiff Joseph Burke's deposition testimony reveals that he believed the davit was factory-installed by Carver. (Joseph Burke Dep. 20:12-21:3, 52:24-53:8, Mar. 27, 2007.) It was not until after the accident that Joseph Burke discovered that the davit was an after-factory addition. (*Id.*) Therefore, given these undisputed facts, any

theory of liability in this case based upon the existence of a nondelegable duty must fail as a matter of law.

A. Negligent Selection, Interference/Instruction, and Supervision

Plaintiffs contend that Quick Lift should not be deemed an independent contractor because SIBS interfered in the work of Quick Lift by negligently instructing the Quick Lift employee as to the proper manner to install the davit, including a representation that the installation location was reinforced. Specifically, plaintiffs allege that Quick Lift relied entirely on representations by SIBS' employee named "Joey" in determining where and how to install the davit. (Pls.' Memorandum of Law, at 4.) Plaintiffs also assert that SIBS negligently selected and supervised Quick Lift. As discussed below, this claim survives summary judgment.

(1) Negligent Interference/Instruction

Courts have held that an employer may be liable for the acts of an independent contractor "where a party interferes with the contractor's work or directs how a part of the work should be done and such interference or direction is a proximate cause of injury to others." *Horn v. State,* 297 N.Y.S.2d 795, 798 (App. Div. 1969): *cf. Toscarelli v. Purdy,* 629 N.Y.S.2d 833, 836 (App. Div. 1995) (holding that submission of its general policy guidelines to subcontractors did not constitute sufficient control); *Beach v. Velzy,* 238 N.Y. 100, 104 (N.Y. 1924) ("That appellant gave some directions, not as to method or means of doing the work, but as to the work to be done, does not change the relation of the parties. He did little more than to furnish some verbal specifications for the roofing, leaving to

claimant control over the time, method, and means of doing the work.") "Such liability is premised on the fact that, where the employer directs the employees of the independent contractor to work in ways other than those the independent contractor has knowledge of or approves, harms resulting therefrom should be compensated by the controlling or interfering employer and not the subordinate independent contractor." *Waite v. Am. Airlines, Inc.*, 73 F. Supp. 2d 349, 356 (S.D.N.Y. 1999).

Plaintiffs argue that Piles, the installer for Quick Lift, relied on the statements of "Joey," an SIBS employee, as to the location of the davit installation and the reinforcement of the boat. Plaintiffs contend that, as a result of this reliance, Piles installed the davit in an inappropriate manner which lead to its failure. Specifically, plaintiffs point to testimony from Piles at his deposition that "Joey told me that it was reinforced." (Piles Dep. 118:5-10, Mar. 22, 2008.) Piles further emphasized his reliance on "Joey" in the following deposition testimony:

> **Q: So if I understand you, other than your own expertise, the only person that gave you information was Joey From Staten Island Boat Sales?**
>
> A: Correct.
>
> **Q: You didn't get any information from Carver is that correct?**
>
> A: I felt there was no need when Joey is the service manager and he deals with Carver.

(Piles Dep. 62:7-15, Mar. 22, 2007.) Similarly, Piles further testified:

> **Q: Did you actually go down below deck to see if it was possible?**
>
> A: No, I didn't. I opened the door and I looked. There was no access. Joey told me there was no access. That was reinforced by installing on top. There was no way to get underneath that area because of the plumbing.
>
> **Q: Again based upon what Joey told you, you basically assumed that the deck of the boat where the base plate was installed was going to be adequate for this job?**
>
> A. Correct.

(Piles Dep. 63:15-64:2, Mar. 22, 2007.) When questioned as to the manner of installation with regard to the screw compatibility, Piles testified:

> **Q: Did you do anything to determine what screws were going into?**
>
> A: I went and I put them in because Joey told me it was reinforced.

(Piles Dep. 57:14-17, Mar. 22, 2007.)

SIBS argues that, although SIBS may have told Piles where on the boat the davit was intended to be placed, SIBS never instructed Piles as to the manner of installation. (Defs.' Reply ¶ 8.) SIBS further notes that Piles stated that no one from SIBS helped him with the actual installation itself. In particular, Piles testified:

> **Q: Did Joey participate with you in actually screwing the base plate in?**

8

A: No.

**Q: So were you the one who did the installation . . . .**

A: Correct.

(Piles Dep. 59:13-24, Mar. 22, 2007.)

Moreover, SIBS submitted an affidavit from one of its employees, Joseph "Joey" DeLuca, who stated, "I never told anyone from Quick Lift how to do their job. I never gave any direction or control of the means, manner or method of installation to anyone from Quick Lift." (DeLuca Aff.)

Although SIBS has submitted the DeLuca Affidavit to rebut the testimony of Piles, the Court cannot conclude, under a summary judgment standard, that plaintiffs' negligent interference/instruction claim must fail as a matter of law. Any issues regarding Piles's credibility cannot be resolved by this Court. *See, e.g., Vital v. Interfaith Med. Center,* 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment. Any weighing of the evidence is the prerogative of the finder of fact, not an exercise for the court on summary judgment."); *see also Curry v. City of Syracuse,* 316 F.3d 324, 333 (2d Cir. 2003) ("[I]t is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'") (quoting *Fischl v. Armitage*, 128 F.3d 50, 55-56 (2d Cir. 1997)); *see also Huff v. UARCO, Inc.*, 122 F.3d 374, 385-86 (7th Cir. 1997) ("We do not imply that plaintiffs have a strong case but rather only that they have enough of a case to go to a jury.").

Moreover, although SIBS argues that liability is precluded because even under Piles's version "Joey" did not assist in the installation itself, the Court disagrees. Viewing all facts in the light most favorable to plaintiffs (including drawing all reasonable inferences in plaintiffs' favor), a reasonable jury could find that Piles relied on the directives of SIBS employee "Joey" as to the reinforcements and location of installation and, thus, is liable because of its negligent interference/instruction regarding the installation of the davit, even though Piles performed the actual installation.

B. Negligent Selection and Supervision

Plaintiffs also contend that, in addition to providing negligent instruction, SIBS was negligent in hiring and supervising Quick Lift with respect to the installation of the davit.

Under New York law, it is well-settled that "an employer has the right to rely on the supposed qualifications and good character of the contractor, and is not bound to anticipate misconduct on the contractor's part, the employer is not liable on the ground of his having employed an incompetent or otherwise unsuitable contractor unless it also appears that the employer either knew, or in the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work." *Maristany v. Patient Support Servs., Inc.,* 693 N.Y.S.2d 143, 145 (App. Div. 1999). Thus, "[t]o hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the contractor's propensity for the conduct which caused the injury." *Bellere v. Gerics,* 759 N.Y.S.2d 105, 107 (App. Div. 2003) (citation omitted).

9

In the instant case, it is undisputed that, although Piles had done some 300 davit installations over the course of his 10-year career, he had never installed a davit on a Carver boat and, thus, did not know how davits had been installed by Carver on its own boats. SIBS correctly points out that there is no evidence that Piles, or anyone else, ever informed SIBS of this lack of experience as to the installation of davits on Carver boats. However, in considering this evidence, one must also consider, as discussed *supra*, the interactions between Piles and the SIBS employee "Joey" during the installation of the davit on SIBS's premises. In particular, Piles testified as to his conversations with Joey in which Joey told him, among other things, that there was no access underneath the area because of plumbing and that it was reinforced by installing the davit on top. (Piles Dep. 63:15-64:,1 Mar. 22, 2007.) Piles also noted in his deposition, when asked if he obtained any information from Carver, that he "felt there was no need when Joey is the service manager and he deals with Carver." (Piles Dep. 62:7-15, Mar. 22, 2007.) Therefore, again viewing the evidence in the light most favorable to the non-moving party, a reasonable jury could conclude that it should have been clear to Joey, based upon Piles's discussion with him about how to install the davit, that Piles lacked the experience or expertise to perform such installation on a Carver boat. Although defendants have pointed to evidence in the record to undermine that argument by plaintiffs, as with the negligent interference/instruction theory, there is sufficient evidence to survive summary judgment on the negligent hiring and supervision theories of liability.

## IV. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is denied.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 11, 2008
Central Islip, New York

\* \* \*

The attorney for plaintiffs is J. Stephen Simms of Simms Showers LLP, Twenty South Charles Street, Suite 702, Baltimore, Maryland, 21201. The attorney for defendant is David P. Feehan of Hoey, King, Toker & Epstein, 55 Water Street, 29th Floor, New York, New York 10041.