UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 05-CV-3731 (JFB) (WDW)

———————————

JOSEPH & MARIA BURKE,

Plaintiffs,

VERSUS

QUICK LIFT, INC., ET AL.,

Defendants.

———————————

**MEMORANDUM AND ORDER**
October 23, 2009

———————————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Dr. Joseph and Maria Burke (collectively, the "Burkes" or "plaintiffs") brought this admiralty and derivative torts action against defendants Quick Lift, Inc. ("Quick Lift")[1] and Staten Island Boat Sales ("SIBS" or "defendant"), alleging that the Burkes were injured as a result of defendants' respective failure to properly install and properly supervise the installation of a piece of equipment, a davit, on a yacht purchased by the Burkes. This Court has jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1333 and 1367. On March 30 and 31, 2009, a bench trial was held to determine defendant SIBS's liability, if any, for injuries suffered as a result of the davit's failure. Having held a bench trial, the Court now issues its findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, and concludes, after carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, that defendant SIBS bears no liability for the injuries incurred by plaintiffs. Specifically, as set forth in detail below, the Court finds that plaintiffs have failed to carry their burden of proving, by a preponderance of the evidence, that any employee of defendant SIBS negligently interfered with the installation of

---

[1] Quick Lift has been dismissed as a party from this action by Stipulation of Dismissal filed April 29, 2008, which reported that the parties had resolved all claims as to Quick Lift. Similarly, all claims against third-party defendant Carver Boat Corporation, LLC have been resolved and have been dismissed by stipulation.

the davit or negligently supervised that installation. Accordingly, the Court enters judgment in favor of SIBS.

I. BACKGROUND

On August 5, 2005, plaintiff filed a complaint against defendants Quick Lift and SIBS, alleging a maritime tort claim against both defendants for negligent installation, and a derivative claim for loss of consortium. Specifically, the complaint alleged, among other things, that: "SIBS, acting through Quick Lift, and Quick Lift, had a duty to the Burkes to properly install the davit. They breached that duty, and the Burkes have suffered damages that SIBS's and Quick Lift's negligence proximately has caused . . . ." (Complaint ("Compl.") ¶ 34.) The complaint asserted three claims against SIBS – namely, negligence (Count One), breach of warranty (Count Two), and a derivative claim for loss of consortium (Count Three). On June 8, 2006, the Court "so ordered" a stipulation discontinuing the breach of warranty cause of action with prejudice.

On October 12, 2005, Quick Lift filed a third-party complaint against Carver Boat Corporation, LLC, alleging that any damages suffered by the Burkes were caused by the third-party defendant Carver.

On July 14, 2006, defendants SIBS and Quick Lift moved to dismiss the Burkes' complaint. Also on July 14, 2006, third-party defendant Carver moved to dismiss Quick Lift's third-party complaint and, in a separate motion, to impose sanctions against Quick Lift for filing a frivolous pleading. On November 16, 2006, the Court denied the motion to dismiss by defendants SIBS and Quick Lift, denied third-party defendant Carver's motion to dismiss the third-party complaint, and denied Carver's motion for sanctions against Quick Lift, Inc.[2]

On November 19, 2007, a stipulation and order of dismissal was entered discontinuing the third party action against Carver. On December 21, 2007, defendant SIBS filed a motion for summary judgment on the remaining negligence claim against it. The motion was fully submitted on February 1, 2008 and oral argument took place on April 4, 2008. By Memorandum and Order issued on April 11, 2008, the Court denied SIBS's motion, ruling that material issues of fact regarding whether a SIBS employee supervised the installation precluded summary judgment in defendant SIBS's favor.[3] Familiarity with that decision and the facts and legal analysis contained therein is presumed. On April 29, 2008, the Court "so ordered" a stipulation dismissing, with prejudice, all claims, cross-claims and third-party actions against defendant Quick Lift.

On March 24, 2009, the Court bifurcated the scheduled bench trial on the respective issues of liability and damages. A bench trial was held on March 30 and 31, 2009 on the issue of liability.[4]

---

[2] *See Burke v. Quick Lift, Inc.*, 464 F. Supp. 2d 150 (E.D.N.Y. 2006).

[3] *See Burke v. Quick Lift, Inc.*, No. 05 Civ. 3731 (JFB) (WDW), 2008 WL 1744532 (E.D.N.Y. Apr. 11, 2008).

[4] The Court notes that, on March 28, 2009, plaintiffs filed a motion to compel defendant's response to a series of interrogatories regarding the alleged negligent installation of the davit, served by plaintiff on January 19, 2006, pursuant to Rule 36 of the Federal Rules of Civil Procedure. Specifically, plaintiffs argued that, because

2

defendant allegedly failed to submit a proper response to their interrogatories until March 25, 2009, well after the close of discovery on July 27, 2007, plaintiffs were entitled to either an order deeming those admissions admitted or an order directing defendants to file "sufficient" answers. Further, plaintiffs sought attorney's fees for the costs of filing the motion to compel, pursuant to Rule 37(b)(2) of the Federal Rules of Civil Procedure. The Court orally denied plaintiffs' motion, without prejudice to renewing it at the close of the case, on the record during the bench trial proceedings of March 30, 2009, and instructed plaintiffs to present their case at trial as if the admissions were not deemed admitted and, therefore, they had to prove negligent installation. The Court then provided defense counsel with an opportunity to respond in writing to the renewed motion after the conclusion of the proceedings. (Trial Transcript ("Trial Tr.") at 7-8.) Defense counsel filed its opposition to plaintiffs' motion on April 15, 2009. Plaintiffs submitted their reply on April 30, 2009. After reviewing the submissions by counsel, the Court now denies plaintiffs' motions, both for admissions and costs. As a threshold matter, it is far from clear that defendant submitted its responses in an untimely manner, as defense counsel has represented (and provided supporting documentation suggesting) that the initial response to plaintiffs' request for admissions was sent to plaintiffs on or about February 1, 2007, within the appropriate discovery deadline, taking into account the suspension of discovery to allow for motion practice, as well as further extensions of deadlines requested by the parties. (*See* Docket Entry No. 91, Ex. B.) To that end, in a letter addressed to Magistrate Judge Wall dated August 28, 2007 under the heading "Remaining Discovery Issue," plaintiff states that "[t]he remaining discovery issue is, that Staten Island Boat has not submitted for its 30(b)(6) deposition." (*See id.*, Ex. 4.) No argument of inadequate interrogatory responses is raised therein. Further, having not performed the installation of the davit, SIBS was not in a position to admit or deny any alleged negligence therein and, therefore, its responses to the interrogatories were sufficient. Moreover, in the pre-trial order filed on February 13, 2009 with the Court, defendant did not concede negligent installation. Plaintiffs could not have been surprised that defendant was unwilling to admit this allegation and indeed, have pled no hardship or prejudice incurred as a result of defendant's alleged failure to timely file sufficient responses to the interrogatories. Finally, because the Court finds (as set forth *infra*) that the davit was negligently installed, the proposed admissions as to that fact are rendered moot. Accordingly, plaintiffs' motion to compel is denied and an award of costs for an alleged failure of defendant to adhere to the rules governing discovery procedure is not warranted under these circumstances.

On March 30, 2009, plaintiffs presented their case-in-chief, which included the live testimony of witnesses Joseph Burke, Maria Burke, and Jonathan J. Howe, and the deposition testimony of Daniel Piles, James Berkebile, and Michael Osmanski. Defendant cross-examined the live testimony of all of plaintiffs' witnesses. At the conclusion of plaintiffs' case-in-chief, defendant moved for judgment as a matter of law. The Court reserved judgment. On March 31, 2009, defendant presented its case, which included the live testimony of witnesses Joseph Deluca and Michael Greco. Plaintiffs made a motion to strike the testimony of Joseph Deluca and Michael Greco, which the Court denied orally on the record, for reasons set forth therein. (Trial Tr. at 83-86, 98-100.) Plaintiffs cross-examined both witnesses. At the conclusion of the proceedings, defendant renewed its motion for judgment as a matter of law and the Court again reserved judgment. The parties' respective proposed findings of fact and conclusions of law were fully submitted

by April 15, 2009. The Court has fully considered all of the evidence presented by the parties. Below are the Court's findings of fact and conclusions of law.

II. FINDINGS OF FACT

The following sections constitute findings of fact[5] by the Court and are drawn from the undisputed facts submitted by the parties in the Joint Pre-Trial Order ("P.T.O."), trial exhibits, including depositions taken during discovery and admitted into evidence as trial exhibits ("Tr. Ex."), and witness testimony at trial on March 30, 2009 and March 31, 2009 ("Trial Tr.").

A. Sale of the Vessel and Davit

In or about May 2000, SIBS sold the subject vessel, a Carver Pilothouse Voyager, to Dr. Burke. (P.T.O. ¶ 1.) SIBS contracted with Quick Lift for the purchase and installation of a davit, Model QLH 800 with a lifting capacity of eight hundred pounds, into the subject vessel. (*Id.* ¶ 2.) A davit is a crane-like device that is utilized for raising and lowering smaller boats or dinghies to and from a larger boat. (Trial Tr. at 25.) It is comprised of a standpipe, which is mounted to the boat, and an arm which extends out from the standpipe. (*Id.* at 39, 61-62; Tr. Ex. 1, 4, 5.)

B. Installation of the Davit

Michael Osmanski, a Regional Service Manager for Carver, testified via deposition that davits are meant to be installed in a particular location "on the aft section of the bridge" of the subject boat. (Tr. Ex. 6 at 7, 18.) Indeed, there is a round-shaped "landing" on the upper deck of the Carver boat on which the round, upper plate of the davit is supposed to be mounted. (*Id.* at 20.) The landing is constructed of fiberglass and there is an aluminum plate laminated within the upper deck. (*Id.*) The aluminum plate is three-eighths of one inch thick and shaped like a doughnut. (*Id.* at 20-21.) Significantly, there is no such aluminum plate embedded in the lower deck, where the davit's base is mounted. (*Id.* at 21-22.) James Berkebile, Vice President for New Product Development for Carver Boat Corporation, testified, also via deposition, that the area where the davit is installed was specifically engineered for this purpose by Carver. (Tr. Ex. 8 at 9-11, 76.) Indeed, the very reason why the embedded plate on the upper deck was doughnut-shaped was to accommodate a davit. (*Id.* at 76.) In effectuating davit installations, Carver secures the upper plate of the davit to the upper deck by drilling and screwing or "tapping" directly into the upper deck and the doughnut-shaped aluminum plate embedded within. (Tr. Ex. 6 at 27-28.) The base of the davit is "through bolted" to the lower deck and to an aluminum backing plate which is added. (*Id.*) Osmanski testified that the "through bolt" installation is easier when done while the boat is being assembled, but can still be done in an after-market installation. (*Id.* at 28-29.) That is, once the boat is constructed, it is still possible to add the backing plate and through bolts and use washers and locknuts to secure the base down. (*Id.*)

The davit was custom-made and installed by Quick Lift. Daniel Piles ("Piles"), the Vice-President of Sales, testified via deposition that the Burkes' davit was "custom made shorter for Staten Island Boat Sales because they required the davit to fit in the

---

[5] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

4

same spot that they put their factory davit on [the vessel]." (Tr. Ex. 7 at 20-21.) Specifically, Piles stated that SIBS asked Quick Lift to build an 800 pound davit with a shorter boom to fit the subject vessel (*id*. at 21), and that he created a template that he took to the subject vessel to ensure that it was the right fit. (*Id*. at 37-38.) Piles represented that a SIBS "service guy or the parts guy" named "Joey" discussed the specifications of the davit and showed him to the Burkes' vessel to perform the measurement with the template. (*Id*. at 34, 36-37.)

Piles then returned to Quick Lift's premises in Miami, constructed the davit, shipped it to SIBS, and returned to install it in or about May of 2000. The davit was installed at that time on SIBS's premises by Piles and his brother, Salvatore Piles, Jr., another employee of Quick Lift. Though Piles knew of the location on the subject vessel where davits were installed by Carver, he did not know the details of the manner of proper installation. (*Id*. at 130.) In fact, although Piles had done some 300 davit installations over the course of his 11-year career, he believed that the date in question was the first time he had installed a davit on a Carver boat. (*Id*. at 105-06.) Piles had seen factory installations on other Carver boats, but only by looking from the outside. (*Id.* at 130.) Accordingly, Piles did not know exactly how the davits had been installed by Carver and he did not know if they were installed in the same manner in which he had installed the davit on the Burkes' boat.[6] (*Id.* at 130-31.)

---

[6] Although Piles also maintained at his deposition that the SIBS employee "Joey" instructed him as to the proper installation procedure, the Court does not credit that testimony. Piles testified at his deposition that, in reliance on instructions from a "Joey" at SIBS, Piles first opened a hole in the

Upon opening the hole in the upper deck, Piles physically observed the aluminum plate embedded within the upper deck in that area. (*Id*. at 45-46, 107.) Piles then applied adhesive and, using "sheetmetal" screws, he screwed the top plate of the davit into the upper deck and the embedded, doughnut-shaped aluminum plate. (*Id*. at 53-55, 109-10.) After he installed the top plate on the upper deck, Piles then installed the base plate on the lower deck. (*Id*. at 55-56.) To do so, he applied adhesive under the base plate and used "[i]nch and a quarter stainless steel" self-tapping, sheetmetal screws which he screwed into the lower deck. (*Id*. at 56-57.) Piles

---

area of the upper deck which had been designed to accept the davit. (Tr. Ex. 7 at 39.) Piles asserted that "Joey told [him] that Carver had engineered that spot for that davit to hold that weight" and "[Joey] said that all the boats were reinforced in that location for the davit." (*Id*. at 48, 41.) Piles further testified that "Joey" did not provide "any details as to what reinforcing existed on the Carver below the base plate," but rather "just told [him] it was reinforced." (*Id*. at 131.) According to Piles, "Joey" did not physically perform any part of the installation, but rather was present "in the yard" with Piles when he performed the job, as described below. (*Id*. at 59.) Having reviewed and evaluated all of the evidence (including the testimony of all witnesses), the Court finds that the portion of the deposition testimony by Piles, in which a SIBS employee named "Joey" purportedly gave him instructions and told him that the boat was reinforced to hold the davit simply by installing it with the base plate, to be lacking in credibility in light of the other evidence in the case (including the testimony of SIBS employee Joseph Deluca), which credibly demonstrated otherwise. For purposes of convenience (and to avoid unnecessary repetition in this Memorandum and Order), a discussion of the grounds for the Court's rejection of this vague assertion by Piles is contained in the Conclusions of Law section.

5

testified that he thought he was screwing into a properly reinforced deck. (*Id*. at 57-58.) Although he had pre-screwed the holes into the lower deck, Piles did not recall if he observed any metal shavings. (*Id*. at 58, 131.) Moreover, although Piles acknowledged that he can generally feel if he is hitting metal while drilling such holes, he could not recall if he had felt metal when he pre-drilled the holes into the lower deck. (*Id*. at 107.) As such, Piles acknowledged that he did not know whether he was screwing into a fiberglass mat, plywood, or anything else as he installed the base plate on the lower deck. (*Id.* at 59.) Piles did not use any "through bolts" or other anchoring in installing the davit's base plate on the lower deck.[7] (*Id*. at 56, 63.) As noted, however, the manufacturer uses through bolting and an aluminum backing plate in mounting the base plate during post-manufacture davit installations on the subject Carver boat. (Tr. Ex. 8 at 31-32, 76-77.) Further, Piles did nothing to confirm "Joey's" alleged statement that the deck was reinforced, *i.e.*, he did not contact the manufacturer. (Tr. Ex. 7 at 58-59.) Neither Piles nor Quick Lift maintained a library of manufacturers' plans, specifications or instructions regarding the different boats on which davits were installed. (*Id*. at 115-16.)

Piles could not recall the last name of the aforementioned "Joey," but states that "[h]e was a service guy or the parts guy, but he was the one that did all the orders at the time." (*Id*. at 34.) When asked about whether "Joey" was the SIBS employee who first called him to order the davit, Piles stated: "Yes, Joey was always the one that called me." (*Id*. at 85.) Furthermore, when asked whether he felt that "Joey" was knowledgeable with regard to Carver boats, Piles responded: "Yeah, I feel the guy talking to me is the one that orders them. I think he should know." (*Id*. at 125.) When Osmanski was asked whether he knew about "Joey from Staten Island Boat Sales," he responded that he knew that individual to be "Joe Martinez." (Tr. Ex. 6 at 77.) Osmanski further stated that "Joe Martinez" was referred to as "Joey," and that he worked for Peter Hoffman, the service manager at SIBS. (*Id*.) Osmanski also noted that there was a "Joey" who worked in the parts department, as well. (*Id*. at 78.)

At the time of the installation, an individual named Joseph "Joey" Deluca worked as a parts manager for SIBS. (Trial Tr. at 86-87.) Deluca testified at trial that, as a parts manager, he attended to the parts inventory and ordered any parts customers requested from the sales department. (*Id*. at 87.) Deluca ordered the davit from Quick Lift for the Burke vessel, which was shipped to him in the parts department. (*Id*. at 89-90.) Upon receipt of the davit, Deluca "tagged" it with the sales receipt indicating the customer who ordered it, and "[left] it out in the yard to be installed." (*Id*. at 90.) Deluca recalls an individual from Quick Lift coming to SIBS to perform the installation, and testified that the name "Danny Piles" sounded familiar. (*Id*. at 90.)

Deluca did not instruct the individual from

---

[7] When asked if he could have through-bolted the base plate, Piles stated that there was no way to access the underside of the lower deck to do so. Specifically, Piles testified that "Joey told [him] there was no access. That was reinforced just by installing on top. There was no way to get underneath that area because of the plumbing." (Tr. Ex. 7 at 63-64.) However, as noted *supra*, the Court finds the testimony regarding the alleged representations by "Joey" not to be credible in light of all of the evidence in the case, which is discussed in more detail in the Conclusions of Law section.

6

Quick Lift who installed the davit onto the Burke vessel as to the proper procedure for doing so. (*Id*. at 90-92.) Deluca reports that the conversation he had with this installer would have been as follows: "Danny, the davit has arrived, and there it is in the yard." (*Id*. at 91, 97.) Deluca was unaware of any other calls or conversations other employees had with Quick Lift. (*Id*. at 93.) He was also unaware of any other SIBS employee who went by the name of "Joey," though he was aware of an individual who went by the name of "Joe" who "probably" worked in the service department. (*Id*.) Deluca testified that there were approximately twenty to thirty individuals who worked "in the yard" during May of 2000, and he did not know them all by name, as that was not his job. (*Id*. at 97.)

Michael Greco, the current service manager and customer service representative of SIBS, also testified at trial. (*Id*. at 101.) According to Greco, an individual by the name of "Joe Martini" was a SIBS employee working in the service department in 2000. (*Id*. at 102.) Greco testified that Martini's job duties would have included selling propellers, spare part kits, and extended warranties to customers, signing warranty papers with customers before they took possession of their vessels, and then directing those customers to their next point of destination. (*Id*. at 103.) Greco further testified that, based on his knowledge of the service department as its current manager, Martini's job requirements in 2000 would "rarely" have involved conversations with vendors. (*Id*. at 104.) Specifically, Greco stated that, in 2000, a vendor such as Quick Lift would receive a part from the parts manager and then would meet with the service manager, who would guide the vendor to the vessel, give the vendor the keys and ensure that the vendor did not leave a mess after the work was completed.

(*Id*. at 105.) The service manager in May 2000 was an individual named Peter Hoffman. (*Id*. at 106.) Greco testified that "back in 2000 . . . Joe Martino would have no involvement in that that I can say." (*Id*. at 105-06.)[8] Finally, Greco stated that, based on his knowledge of SIBS's policies and procedures, "nobody would allow anybody from our company to instruct a company how to install a product." (*Id*. at 108.) He conceded, however, that though he would take no part in a vendor's installation of a part, he could not speak for anyone but himself. (*Id*. at 112.)

C. Failure of the Davit

Dr. Burke used the davit "fairly frequently," but did not experience any problems in its operation from the time that he took possession of his vessel in 2000 until April 19, 2005. (Trial Tr. at 26, 43-44.) On the morning of April 19, 2005, the davit experienced a failure, breaking out of the deck of the subject vessel when Mrs. Burke attempted a routine raising of the dinghy to the flybridge. (P.T.O. ¶ 3; Trial Tr. at 27.) There had never been any problems with the davit before that date. (Trial Tr. at 26.) Prior to the April 19, 2005 failure, Mrs. Burke had operated the davit many times and did not operate the davit any differently on that day. (*Id.* at 45.) When the davit began to break out of the deck, Mrs. Burke heard the sound of fiberglass ripping and held onto the davit in an attempt to keep it from pulling apart from the boat and dropping the dinghy onto Dr. Burke, who was positioned below the deck directly underneath that craft. (*Id*. at 46-47.) In doing

---

[8] The individual in question was referred to as "Joe Martini," "Joe Martino," and "Joe Martinez" during the proceedings. For consistency's sake, he will hereinafter be referred to as "Joe Martini."

7

so, she experienced great physical pain. (*Id.* at 47-49.) Specifically, Mrs. Burke testified as follows:

> QUESTION: Did there come a time when something went wrong with the davit that day?
>
> ANSWER: Yes.
>
> QUESTION: What happened?
>
> ANSWER: As [Dr. Burke] said "push the button" to lift the actual dinghy, the small boat – usually it goes up slowly, and all of a sudden – I would say it had been lifting slowly, and I started to hear this garbled crackling sound behind me. I couldn't see the garble, but it sounded like something was ripping.
>
> QUESTION: Have you ever heard that sound before?
>
> ANSWER: Absolutely not.
>
> QUESTION: What happened?
>
> ANSWER: I twisted aside to see what was crackling behind me and all I saw was the fiberglass was ripping apart. At that point I was holding the davit. Joe was under the boat. I really couldn't visualize him at that point, so I started screaming. Because pretty much I could see that it was going to rip out, and I presumed it would rip out all the way and crash him or land on him.
>
> QUESTION: Where, in relation to the davit, was the fiberglass ripping out?
>
> ANSWER: I guess it was where it connected to the actual boat, the hull of the boat, the piece of the boat.
>
> QUESTION: And as this process was going forward, what, if anything, did you feel?
>
> ANSWER: I felt the davit, the arm, was starting to drop. I could see the beginning guy was kind of dropping six inches, twice, so it was starting to pull harder. Behind me, I could see a piece of the boat was just ripping apart. And between screams, my first reaction was I held on to the davit to prevent it from separating from the boat.
>
> QUESTION: Did this have any physical effect on you?
>
> ANSWER: Yes. At the time, it just was like everything hurt. I really don't know why, but I held on to it. And I could feel it pulling away from me, so I felt my whole back legs kind of pulling in different directions, not consistent with the way it should be.

(*Id.* at 46-48.)

8

James Berkebile, Vice President for New Product Development for Carver Boat Corporation, inspected the subject vessel after the failure of the davit. Upon looking at the location where Quick Lift's davit was installed in this case, Berkebile testified that the davit was installed in the proper location. (Tr. Ex. 8 at 65-66.) Indeed, the davit was installed in the same location as the factory-installs by Carver, but it was done "in a different manner." (*Id.* at 66.) Specifically, when the davit is factory-installed, a plate is added and the davit is through bolted.[9] (Tr. Ex. 6 at 27-28.) Piles had mounted the Quick Lift davit's base plate to the boat's lower deck "in a different manner than a factory-installed installation" (Tr. Ex. 8 at 65-66), *i.e.*, without inserting an aluminum base plate or through-bolting the base of the davit to the lower deck.

Plaintiffs' expert, Accredited Marine Surveyor Jonathan J. Howe, testified that his survey of Mr. Burke's vessel, conducted after the April 19, 2005 incident, indicated that the davit failure was due to the inadequate installation of its base. (Trial Tr. at 55.) More specifically, Howe observed that if the base of a davit is secured in a manner such that it cannot move, and the deck of a vessel is reinforced such that it, too, cannot move, the davit can bear its intended load. (*Id.* at 57.) However, in the case of the subject vessel, there was no reinforcement in the deck area and, thus, "over time, the fasteners failed and the base moved, causing the cracking of the fiberglass and the davit to come down." (*Id.*) Howe stated that the base of the davit in question should have been "through-bolted instead of screwed" and "should have [had] a backing plate on it to spread the load over a large area." (*Id.* at 62.) Howe concluded, in his expert opinion, that "if [the davit] had a proper backing plate on it and was through-bolted, that davit would still stand today." (*Id.* at 64.)

### III. BURDEN OF PROOF

Plaintiffs bear the burden of offering evidence in support of the allegations set forth in the complaint and proving those allegations by a preponderance of the evidence. *See Fernandez v. Chios Shipping Co.*, 542 F.2d 145, 155 (2d Cir. 1976) (plaintiff bears burden of proof by preponderance of the evidence in maritime tort action); *accord Cigna Property & Cas. Ins. Co. v. Bayliner Marine Corp.*, No. 92 Civ. 7891 (AGS), 1995 WL 125386, at *11 (S.D.N.Y. Mar. 22, 1995); *Dunn v. Southern Charters, Inc.*, 539 F. Supp. 661, 670 (E.D.N.Y. 1982).

### IV. CONCLUSIONS OF LAW

Plaintiffs submit that, first, the installation of the davit by Quick Lift was negligent and led to its failure and, second, SIBS bears liability for injuries suffered as a result of that failure because it provided negligent instruction and/or supervision to Quick Lift, the independent contractor that installed the davit. Specifically, plaintiffs argue that the evidence at trial demonstrated that a SIBS employee named "Joey" negligently instructed Piles on how to install the davit and negligently supervised that procedure, and the injury Mrs. Burke suffered when the davit failed on April 19, 2005 was directly attributable to that negligence. For the reasons set forth below, the Court finds that, although independent contractor Quick Lift negligently installed the davit, plaintiffs have failed to prove by a preponderance of the

---

[9] Osmanski defined "through bolted" as twining a bolt through the top of the davit's bottom base plate and securing it on the bottom with washers and a nut. (Tr. Ex. 6 at 28.)

9

evidence that SIBS was negligent in any way in connection with the installation of the davit by Quick Lift. Thus, the Court finds in favor of the defendant SIBS on the negligence claims against it.

A. Negligent Installation of the Davit

Under New York law, a plaintiff must establish the following elements to prove negligence: (1) that a duty of care was owed by the defendant to the plaintiff; (2) that the defendant breached that duty; (3) that the defendant's breach was a proximate cause of the plaintiff's injuries; and (4) that plaintiff was damaged. *See Luina v. Katharine Gibbs Sch. N.Y., Inc.*, 830 N.Y.S.2d 263, 263 (App. Div. 2007); *Talbot v. N.Y. Inst. of Tech.*, 639 N.Y.S.2d 135, 136 (App. Div. 1996).

Before reaching the issue of whether SIBS has any liability for the alleged negligent installation of the davit by Quick Lift, plaintiff must first prove that the davit was negligently installed by Quick Lift. Based upon the evidence presented, the Court concludes that the davit was negligently installed by Quick Lift. Plaintiffs presented evidence, by way of the testimony of Berkebile, Piles and Howe, that the manner in which Piles installed the davit diverged from the standard and appropriate practice and that this divergence caused an equipment failure on April 19, 2005. Specifically, Piles used sheetmetal screws rather than through-bolts when securing the davit into the deck of the vessel. Berkebile testified that the factory installation process utilizes through-bolts for that purpose and, indeed, Howe confirmed that through-bolts were necessary in order for the davit to bear its intended load. Second, Piles did not insert a backing plate into the deck to reinforce the davit, as is customary with factory installation, according to Berkebile, and necessary in order for the davit to support its load, according to Howe. Based on his inspection of the vessel, Howe offered the uncontested expert opinion that the davit would not have failed but for the lack of through-bolts and a reinforcing plate. Accordingly, plaintiffs have clearly met their burden of proving that the installation performed by Piles was negligent; Quick Lift had a duty to plaintiffs to correctly install the davit, it breached that duty by failing to do so, and that breach ultimately caused the failure of the davit and plaintiffs' resultant injuries. The Court, however, finds that plaintiffs have failed to prove by a preponderance of the evidence that SIBS was negligent in any way in connection with the installation of that davit. In particular, for the reasons set forth below, the Court rejects the evidence presented by plaintiffs, primarily through the deposition testimony of Piles, that a SIBS employee named "Joey" directed Piles to perform the installation in the above-described manner and supervised that process. That evidence was simply not credible when considered in the context of all of the evidence, including the credible testimony of SIBS employee Joseph "Joey" Deluca and the other evidence offered in the case.

B. Negligent Selection, Interference/Instruction, and Supervision

As stated *supra*, "[i]t is fundamental that to recover in a negligence action a plaintiff must establish that the defendant owed him a duty to use reasonable care, and that it breached that duty." *Turcotte v. Fell*, 68 N.Y.2d 432, 437 (1986). "In the absence of a duty, as a matter of law, no liability can ensue." *Gonzalez v. Pius*, 525 N.Y.S.2d 868, 869 (App. Div. 1988). However, as noted in the Court's findings of fact, it was Quick Lift,

SIBS's independent contractor, who owed a duty to plaintiffs, and "[t]he general rule is that an employer who hires an independent contractor is not liable for the independent contractor's negligent acts." *Rosenberg v. Equitable Life Assur. Soc.*, 79 N.Y.2d 663, 668 (1992); *see also Chainani v. Bd. of Educ. of the City of N.Y.*, 87 N.Y.2d 370, 380-81 (1995). However, it is well-settled under New York law that an employer may be liable for the acts of an independent contractor "where a party interferes with the contractor's work or directs how a part of the work should be done and such interference or direction is a proximate cause of injury to others." *Horn v. State*, 297 N.Y.S.2d 795, 798 (App. Div. 1969); *cf. Toscarelli v. Purdy*, 629 N.Y.S.2d 833, 836 (App. Div. 1995) (holding that submission of its general policy guidelines to subcontractors did not constitute sufficient control); *Beach v. Velzy*, 238 N.Y. 100, 104 (1924) ("That appellant gave some directions, not as to method or means of doing the work, but as to the work to be done, does not change the relation of the parties. He did little more than to furnish some verbal specifications for the roofing, leaving to claimant control over the time, method, and means of doing the work."). "Such liability is premised on the fact that, where the employer directs the employees of the independent contractor to work in ways other than those the independent contractor has knowledge of or approves, harms resulting therefrom should be compensated by the controlling or interfering employer and not the subordinate independent contractor." *Waite v. Am. Airlines, Inc.*, 73 F. Supp. 2d 349, 356 (S.D.N.Y. 1999).

Plaintiffs alleged that SIBS is liable under this theory, and in denying SIBS's motion for summary judgment, the Court determined that material issues of disputed fact regarding whether Piles, the installer for Quick Lift, relied upon the statements of a SIBS employee named "Joey," as to the location of the davit installation and the reinforcement of the vessel, precluded a ruling in defendant's favor. Accordingly, a bench trial was held to settle outstanding issues of fact, at which time plaintiffs offered the same evidence from the summary judgment stage, in the form of deposition testimony, in an effort to substantiate their allegations on this critical issue – specifically, the deposition testimony of Daniel Piles and Michael Osmanski. Piles testified in his deposition (which was admitted at trial) that the "Joey" who allegedly directed the installation was "a service guy or the parts guy, but he was the one that did all the orders at this time." He further represented that "Joey" was the SIBS employee who "always" called him regarding orders for parts, and that he felt "Joey" was knowledgeable regarding the installation of the davit precisely because "Joey" was the individual who ordered those parts. Osmanski stated that the "Joey" to whom Piles referred was "Joey Martinez," a SIBS employee who worked in the service department under Peter Hoffman, the SIBS service manager at the time.

Defendant presented the live testimony of Joseph "Joey" Deluca, the individual who worked as the parts manager for SIBS at the time of the installation. Deluca testified that as part of his job duties, he ordered any parts customers requested from the sales department, and specifically ordered the davit from Quick Lift that Piles installed in the Burkes' vessel. Deluca was unaware of any other individuals employed by SIBS at the time who went by the name of "Joey." Although there was a "Joe Martini" working for SIBS at the time in the service department, current SIBS service manager Michael Greco testified that, based on his knowledge of the company, Martini's job requirements in 2000

11

would "rarely" have involved conversations with vendors such as Quick Lift.

Because Piles did not appear at the bench trial to provide live testimony and his deposition testimony regarding the identity of "Joey" is vague at best, the Court is left to connect the dots regarding the identity of the individual referenced in Piles's deposition. Defendant offered evidence that the "Joey" in question was actually Joseph "Joey" Deluca, which the Court accepts as credible, in light of the entire trial record. Particularly, the Court notes that the job duties of both individuals involved ordering parts from vendors and informing vendors when those parts had arrived. Moreover, Piles testified that Joey was the only person who "always" called him when parts had arrived, and Deluca stated at trial that his job duties included making those very types of telephone calls. Furthermore, though Deluca could not specifically recall his interaction with Piles, he did recall receiving the davit for the subject vessel, calling Quick Lift to inform them that it had arrived, and delivering that davit to the Quick Lift representative. In sum, Deluca shares the same name and job responsibilities as the individual referenced in Piles's deposition.

Though plaintiffs argued that the "Joey" in question was actually "Joe Martini" (*see* Plaintiffs' Proposed Findings of Fact ¶¶ 10-11), they have failed in proving by a preponderance of the evidence that Martini was the "Joey" in question, or that he provided the alleged negligent instruction. Specifically, Deluca testified that Joe Martini was not known as "Joey," and Michael Greco testified that because Martini worked in the service department, he was not responsible for ordering parts for vendors or informing them when those parts had arrived. Furthermore, though the job duties of the SIBS service manager would have included showing a vendor to a vessel (as Piles represented that "Joey" did), Martini did not hold the position of service manager at the time of the installation, and indeed, his job duties in the service department would have entailed "rare" interactions with the vendors, at best. In fact, the *sole* piece of evidence that corroborates plaintiffs' position is the deposition testimony of Carver representative Osmanski, who stated that "Joey" of SIBS was "Joey Martinez" from the "service department." Osmanski also acknowledged that another "Joey" worked in the parts department. Having thus identified two individuals whom he knew as "Joey" at SIBS, Omanski was in no position to identify which of those individuals dealt with Piles regarding the installation of the vessel, and his deposition testimony sheds no light on how he could possibly know which "Joey" met with Piles. Only Piles had personal knowledge of that interaction, and he provided details about it in his deposition which align with those provided by Deluca on the stand at trial. Therefore, in order for the Court to accept that Martini, and not Deluca, was the "Joey" referenced in Piles's deposition, it would necessarily have to overlook the credible evidence demonstrating that: (1) Deluca, and not Martini, was the only SIBS employee who went by the name of "Joey" at the time of the installation; and (2) Deluca, as a parts manager, and not Martini, was tasked with the job duties specifically described in Piles's deposition, *i.e.*, ordering parts from vendors, calling vendors when the parts arrived, and delivering those parts to the vendors when they arrived to pick them up. Plaintiffs have offered only speculation supporting their position on this issue, while defendant has offered specific credible evidence refuting it. Accordingly, the Court finds that the "Joey" referenced in Piles's deposition was Joseph

12

"Joey" Deluca.[10]

Having done so, the Court must now address the critical question of this case – namely, whether Deluca negligently interfered with Piles's installation of the davit. Piles testified, via deposition, that "Joey" instructed him as to the proper location for the installation of the davit, informed him that the deck was reinforced and thus did not require a separate backing plate to support the davit, further told him that there was no access beneath the deck for the installation of through-bolts, and was physically present while he performed the installation. In direct contradiction to Piles's representations, Deluca took the stand at the bench trial and testified that he gave Piles no instructions whatsoever regarding the installation of the davit. (*See* Trial Tr. at 90-91 ("QUESTION: At any time did you tell Danny Piles how to do his job?  ANSWER: No."); *see also id.* at 91-92 ("QUESTION: In your own words, tell us what conversation, if any, you had with Danny Piles. ANSWER: Danny, the davit has arrived, and there it is in the yard.").) Deluca further stated that he did not guide Piles to the subject vessel or witness any part of the installation process. (*See id.* at 96 ("QUESTION: [Y]ou never went out to this particular boat?  ANSWER: No. QUESTION: You never even saw this boat? ANSWER: No. QUESTION: You never met with Danny Piles except when he came in the office, checked in and left? ANSWER: That's all I need to do. QUESTION: Or his brother? ANSWER: Correct. QUESTION: And you never went out with him on the boat to measure where the davit would go? ANSWER: No.").)

Because the statements of Piles and Deluca are wholly incompatible on this issue, the Court must determine, as the finder of fact, whose testimony to credit.[11] The Court

---

[10] The Court notes that, even assuming that the "Joey" was a Joseph Martini or some other unknown SIBS employee named "Joey," plaintiffs have still failed to prove by credible evidence that any such individuals provided instructions to Piles or were negligent in any way.

[11] On the issue of credibility, the Court notes that only one of these witnesses, Deluca, appeared to testify during the bench trial; Piles testified via deposition. To that end, courts have recognized that, "[d]epositions, deadening and one-sided, are a poor substitute for live testimony especially where, as here, vital issues of fact may hinge on credibility. In determining credibility, there is nothing like the impact of live *dramatis personae* on the trier of the facts." *Polaroid Corp. v. Casselman*, 213 F. Supp. 379, 382 (S.D.N.Y. 1962); *see Nuzzo v. Rederi A/S Wallenco, Stockholm, Sweden*, 325 F.2d 994, 995-96 (2d Cir. 1963) ("Although this is particularly true before a jury . . . a judge also is far more likely to be impressed by a 'live' witness than by reading or listening to the droning of a deposition; furthermore his observation of the witness' demeanor has an importance as to credibility that we have often stressed.") (citing *Dyer v. MacDougall*, 201 F.2d 265, 268-69 (2d Cir. 1952)); *In re Iridium Operating LLC*, 373 B.R. 283, 295 n.3 (S.D.N.Y. Bankr. 2007) ("It is worth noting that with the exception of four expert witnesses hired by the Committee to testify in its case, all witnesses for the Committee appeared electronically by means of designated portions of videotaped depositions. In contrast, Motorola presented the testimony of nine live witnesses, including certain individuals who appeared voluntarily even though they were beyond the subpoena power of the Court. Motorola contributed greatly to its defense by having live witnesses whose credibility could be assessed by the Court. Despite the utility of the videotaped testimony offered by both sides, there is no substitute for observing the demeanor of witnesses who are testifying in person in the courtroom.");

13

observed the demeanor of Deluca on the stand and found him to be very credible. Deluca, who is no longer employed by SIBS, appeared as a non-party witness under the subpoena power of the Court. Direct and cross examinations revealed no bias on his part to sway the outcome of the proceedings one way or another. Moreover, Deluca's recollection of the limited interaction with Piles was consistent with what the duties of his position at SIBS would have dictated at the time. In short, based upon the Court's observations of his demeanor and considering his testimony in light of all the evidence, the Court found Mr. Deluca's testimony to be credible in all respects, including his denial of providing any instructions or representations to Piles.

With respect to Piles's testimony, the Court notes that Piles's description of Deluca's alleged involvement with the installation falls so far outside the parameters of Deluca's job description as a parts manager, as corroborated by Deluca and even Piles himself, that it strains the bounds of credulity. (*See* Trial Tr. at 87 ("QUESTION: What was your duty [as parts manager]? DELUCA: To take care of inventory and order any items or parts a customer needs ordered by the sales department."); *id*. at 96 ("QUESTION: And you never get involved with installing davits? DELUCA: No. QUESTION: During that time [2000], you never went out of the parts department except to come and go? DELUCA: Not necessary. I had no experience to do that. I would order parts. It could be a box. I know a part number; that's it."); *see* Tr. Ex. 7 at 34 ("PILES: [Joey] was the one that did all the orders at the time."); *see id*. at 84-85 ("QUESTION: How did the order [for the davit] first come in from Staten Island? PILES: They, like everybody else, they just called me and told me to give them a quote and they placed me the order. QUESTION: Did Joey call you? PILES: Yes, Joey was always the one that called me.").) There is absolutely no basis whatsoever for the Court to conclude that Deluca, as a parts manager who never even so much as showed vendors to vessels in the yard, unilaterally decided that he would first instruct a vendor on the proper installation of a part, and then personally escort the vendor to the vessel and remain in the vicinity during that installation. Deluca testified credibly that he had never done such a thing, nor would his job have ever called for him to do so. Greco elaborated, in his testimony, that *no* SIBS employee, regardless of whether that individual worked in the parts or service department, would be responsible for providing any such instructions under the policies and procedures of SIBS. (*See* Trial Tr. at 108 ("QUESTION: Are you familiar with any practices or procedures back in 2000 which allowed Staten Island employees to instruct vendors how to install equipment? ANSWER: Yes, I am familiar with the procedures of our company, and nobody would allow anybody from our company to instruct a company how to install a product.").) In short, the Court credits Deluca's testimony that he was not involved

---

*Ioannides v. Marika Mar. Corp.*, 928 F. Supp. 374, 378-79 (S.D.N.Y. 1996) (stating that where "credibility is likely to be an issue . . . depositions are not an adequate substitute where live testimony is reasonably available.") (citing *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1233 (2d Cir. 1996)). It is unclear whether Piles was "reasonably available" to testify, as he could have been beyond the subpoena power of the Court. In any event, the Court has done its best to fully assess the credibility of all witnesses (whether they provided live testimony or deposition testimony), including Piles, by examining their sworn testimony in light of all the evidence.

with Piles's installation of the davit of the subject vessel and finds that plaintiffs have failed to demonstrate, by a preponderance of the evidence, that Deluca (or any other SIBS employee for that matter, including "Joe Martini") negligently interfered with Quick Lift's installation.

C. Negligent Selection and Supervision

Plaintiffs also asserted a claim that, in addition to providing negligent instruction, SIBS was negligent in hiring and supervising Quick Lift with respect to the installation of the davit. Under New York law, it is well-settled that "[s]ince an employer has the right to rely on the supposed qualifications and good character of the contractor, and is not bound to anticipate misconduct on the contractor's part, the employer is not liable on the ground of his having employed an incompetent or otherwise unsuitable contractor unless it also appears that the employer either knew, or in the exercise of reasonable care might have ascertained, that the contractor was not properly qualified to undertake the work." *Maristany v. Patient Support Servs., Inc.*, 693 N.Y.S.2d 143, 145 (App. Div. 1999). Thus, "[t]o hold a party liable under theories of negligent hiring, negligent retention, and negligent supervision, a plaintiff must establish that the party knew or should have known of the contractor's propensity for the conduct which caused the injury." *Bellere v. Gerics*, 759 N.Y.S.2d 105, 107 (App. Div. 2003) (citation omitted).

In denying SIBS's motion for summary judgment, the Court noted that, although there was no evidence indicating that Piles, or anyone else, informed SIBS about his lack of experience related to the installation of davits on Carver boats, the Court could not disregard the alleged interaction between Piles and the SIBS employee "Joey" during the installation of the davit on SIBS's premises, as it was required to construe the evidence presented in the light most favorable to the non-moving party. Specifically, the Court stated that a reasonable fact finder crediting Piles's testimony could also conclude that it should have been clear to "Joey," based upon Piles's discussion with him about how to install the davit, that Piles lacked the experience or expertise to perform such an installation on a Carver boat. Having now heard the testimony of all witnesses, either through live testimony or submitted deposition transcripts, and having carefully weighed all of the evidence, the Court concludes that plaintiffs have not carried their burden of proof on this claim either. Because the Court credits Deluca's testimony that he never participated in Piles's installation of the davit, and indeed, never had a conversation with him wherein he ascertained Piles's level of expertise, SIBS cannot be held liable for the negligent installation of the davit under a theory of negligent hiring and/or supervision.[12]

IV. CONCLUSION

In sum, although plaintiffs have demonstrated that the installation of the davit into the subject vessel was performed in a negligent manner by a Quick Lift employee, they have failed to prove, by a preponderance of the evidence, that SIBS negligently

---

[12] As noted *supra*, to the extent that plaintiffs have attempted to suggest that Piles communicated with some other SIBS employee named "Joey," the Court finds that plaintiffs have failed to prove such fact by a preponderance of the evidence and have also failed to prove that any SIBS employee failed to exercise reasonable care in ascertaining that Quick Lift was properly qualified to undertake the work.

15

interfered with, or supervised that installation, or had any negligent conduct that could provide a basis of liability against SIBS for Quick Lift's own negligence.[13] Accordingly, plaintiffs have failed to satisfy their burden on any of their claims against SIBS and the Court finds in favor of SIBS.[14] The Clerk of the Court shall enter judgment accordingly and close this case.[15]

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:   October 23, 2009
         Central Islip, New York

\* \* \*

The attorney for plaintiffs is J. Stephen Simms, Esq., of Simms Showers LLP, Twenty South Charles Street, Suite 702, Baltimore, Maryland, 21201. The attorney for defendant is David P. Feehan, Esq., of Hoey, King, Toker & Epstein, 55 Water Street, 29th Floor, New York, New York 10041.

---

[13] Plaintiffs' loss of consortium claim against SIBS fails for the same reasons as the negligence claims. *See Goldman v. MCL Companies of Chicago, Inc.*, 131 F. Supp. 2d 425, 427 (S.D.N.Y. 2000) ("It is well established . . . that a loss of consortium claim is not an independent cause of action . . . and may only be maintained . . . pursuant to the primary tort.") (internal quotation marks and citations omitted).

[14] Because the Court has determined that plaintiffs' claims fail on the merits against SIBS, the motion for judgment as a matter of law by SIBS (which the Court had previously reserved decision on) is denied as moot.

[15] The claims against the other defendants have already been resolved, as discussed *supra*.